UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KOLBY EDWARDS )<br>    Plaintiff )<br> )<br>v. )<br> )<br>ISYNERGY, INC d/b/a FINISH LINE AUTO )<br>and )<br>ALLY BANK )<br>    Defendants )<br>_____ ) | CIVIL ACTION NO.<br><br><br><br><br>TRIAL BY JURY DEMANDED<br><br><br>JUNE 19, 2017 |

## COMPLAINT

### I. INTRODUCTION

1. This is a suit brought by a consumer under the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679 *et seq.*; the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42a-110a *et seq.*, against Isynergy, Inc. d/b/a Finish Line Auto ("Finish Line") and Ally Bank ("Ally").  Plaintiff brings this action to recover statutory damages, actual damages, punitive damages, and reasonable attorney's fees and costs.

### II. PARTIES

2. Plaintiff, Kolby Edwards ("Plaintiff"), is a consumer residing in Naugatuck, Connecticut.

3. Defendant Finish Line is a Connecticut corporation located in Wallingford, Connecticut.

4. Defendant Ally is a Utah corporation registered to do business in Connecticut.

### III. JURISDICTION AND VENUE

5. Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1640.

6. This court has jurisdiction over Finish Line because it is a Connecticut corporation.

7. This court has jurisdiction over Ally because it regularly does business in this state.

8. Venue is proper because Plaintiff is a Connecticut resident and the harm alleged occurred in this state.

### IV. FACTUAL ALLEGATIONS

9. On or about April 15, 2017, Plaintiff went to Finish Line to purchase a vehicle.

10. At that time, Plaintiff owned a 2015 Nissan Sentra (the "Nissan") and was current on his payments to the finance company.

11. Plaintiff was interested in a 2014 Jeep Grand Cherokee (the "Jeep") being offered for sale by Finish Line.

12. Plaintiff completed a credit application in order to obtain financing to purchase the Jeep and was approved by Ally.

13. Kenneth Criscione, who identified himself as Finish Line's owner, told Plaintiff that he would not be able to trade the Nissan in, because there was too much negative equity and Ally would not allow him to roll the debt into the financing of the Jeep.

14.     Plaintiff decided that he would not purchase the Jeep and began to leave.

15.     As Plaintiff was walking out, he was approached by Kenneth Criscione, an employee believed to be a finance manager and known to Plaintiff as Mike, and another employee known to Plaintiff as Bianca, and a fourth Finish Line employee whose name is unknown.

16.     The fourth employee asked Plaintiff to wait and that there were other options available that would allow him to purchase the Jeep.

17.     Bianca then told Plaintiff that he had the option to "call the bank and say that you can't afford the Nissan anymore and that the bank needs to come pick it up."

18.     Plaintiff replied that he did not like that idea, because he knew that he would be liable to the bank for the balance if it sold for less than he owed at auction. Plaintiff also did not want to hurt his credit by having a repossession on his credit history.

19.     Bianca, Kenneth Criscione, and Jordan Criscione, another Finish Line representative, told Plaintiff that he could avoid harm to his credit by utilizing a "credit report loophole" that he could exploit in order to rid himself of the Nissan and preserve a positive credit history.

20.     Bianca, Kenneth Criscione, and Jordan Criscione told Plaintiff that, after the bank repossessed the Nissan, it would sell the vehicle at auction for fair market value and that, after the repossession, the bank would call him for a while but would eventually stop calling and he would not have to pay any deficiency.

21. The Finish Line representatives further stated that, following the repossession, they would provide him with a form to use for purposes of having the reporting of the resulting deficiency removed from his credit reports.

22. The Finish Line representatives told Plaintiff that the form would claim that he was not the debtor on the account and that he did not owe the money and, as a consequence of submitting the form, the report would come off his credit reports.

23. The Finish Line representatives stated that sometimes it would be necessary to submit the form more than once before it came off and that Plaintiff should continue to file the form disputing the debt until it was removed from his reports.

24. Plaintiff was not knowledgeable regarding credit reporting and did not know that he could not legally dispute a legitimately reported account, and he believed that he could legitimately not suffer credit harm if he followed Finish Line's advice and guidance.

25. Plaintiff agreed to purchase the Jeep, because he believed that he could do so without harming his credit and because Finish Line had agreed to assist him in having the account for the Nissan removed from his credit report.

26. The Jeep was advertised by Finish Line for $27,095 and Kenneth Criscione informed Plaintiff that was the price being asked for the Jeep.

27. Kenneth Criscione also told Plaintiff that, in order to obtain financing from Ally, Finish Line needed to "move numbers around to make it appealing to the bank."

28. The purchase order prepared by Finish Line listed a purchase price for the Jeep of $26,425.

29. Finish Line also included as part of the transaction a GAP Addendum for $895, a key replacement contract for $699, and an extended service contract for $2,495, and it included these items separately as part of the amount financed on the retail installment sales contract executed by Plaintiff.

30. The retail installment sales contract was assigned to Ally Bank.

31. Plaintiff did not request and did not want the GAP Addendum, the key replacement contract, or the service contract, but they were included as conditions of financing the vehicle and would not have been included in a comparable cash transaction.

32. After completing the transaction, Finish Line kept the Nissan on its lot.

33. Jordan Criscione later sent an email with a subject heading reading 'CREDIT REPAIR" to Plaintiff with instructions on disputing the account for the Nissan. The email stated:

> Here is a copy of the dispute form. Don't forget you must go to http://www.annualcreditreport.com and print all three (Trans Union, Equifax, Experian) credit files prior to making any dispute. Then submit dispute letters on all issues you want to correct. The credit file companies will send you a new credit file once the dispute has been resolved. That should be anywhere between 60-90 days later. Once you receive a new credit file with updated information read it carefully. Any issues that are unresolved resend those letters (a.k.a cycle) again. Repeat that process till all corrections have been made. Any questions feel free and email me any time.

34. Plaintiff called the creditor for the Nissan and told it that he could not afford the payments and that he wanted them to pick up the Nissan.

35. The lender's representative told Plaintiff that if it repossessed the Nissan, he would be responsible for the remaining amount owed.

36. At this point, Plaintiff became suspicious about the advice that had been provided to him by Finish Line, and he told the bank that he would call them back.

37. Plaintiff since learned that he would be liable to the lender on the Nissan and would suffer harm to his credit.

38. In order to avoid credit harm, Plaintiff has continued to make payments for the Nissan, and he now has two vehicles and remains liable for payments for both, even though he has a need for only one vehicle.

## V.  CAUSES OF ACTION

### COUNT ONE – CREDIT REPAIR ORGANIZATIONS ACT (FINISH LINE)

39. Pursuant to 15 U.S.C. § 1679b(a) "No person may— (1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to— (A) any consumer reporting agency (as defined in section 1681a(f) of this title); or (B) any person— (i) who has extended credit to the consumer; or (ii) to whom the consumer has applied or is applying for an extension of credit."

40. Finish Line violated 15 U.S.C. § 1679b(a) by advising Plaintiff to make false and misleading statements to his lender and to Trans Union, Equifax, and Experian.

41. Finish Line acted as a Credit Repair Organization as that term is defined by 15 U.S.C. § 1679a(1) because it provided advice and assistance to Plaintiff for the

express purpose of improving Plaintiff's credit history, credit record and credit rating in exchange for valuable consideration.

42. Specifically, the consideration provided by Plaintiff for the advice and assistance was his purchase of the Jeep, from which Finish Line profited. This purchase would not have occurred if Finish Line had not agreed to furnish advice and assistance in repairing or improving Plaintiff's credit. Plaintiff would not have purchased the Jeep, and Finish Line would not have profited from that sale, if Finish Line had not provided advice and assistance to Plaintiff regarding how to "repair" or improve his credit following the repossession of the Nissan.

43. Pursuant to 15 U.S.C. § 1679c, Finish Line was required to provide the specific disclosure to Plaintiff described in subsection (a) of that statute and secure Plaintiff's signature on that disclosure.

44. Finish Line failed to provide Plaintiff with the required disclosure or follow the other procedures set forth in 15 U.S.C. § 1679c.

45. Pursuant to 15 U.S.C. § 1679g, by violating 15 U.S.C. § 1679b(a) and 15 U.S.C. § 1679c, Finish Line is liable to Plaintiff for actual damages, punitive damages and attorney's fees and costs.

**COUNT TWO – TRUTH IN LENDING ACT (FINISH LINE)**

46. Finish Line is a "Creditor" within the meaning of the Truth in Lending Act ("TILA").

47. Finish Line violated TILA and Regulation Z by including the costs of the GAP, key replacement and the extended warranty as part of the amount financed and failing to disclose that cost as a part of the finance charge.

48. For Finish Line's violations of TILA, Plaintiff is entitled to actual damages, statutory damages of $2,000, and attorney's fees and costs.

### COUNT THREE – CONNECTICUT UNFAIR TRADE PRACTICES ACT (FINISH LINE AND ALLY)

49. Finish Line engaged in unfair and deceptive acts, as aforedescribed, in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* ("CUTPA").

50. Ally is liable as an assignee of the contract and assumes liability pursuant to the following clause in the retail installment sales contract:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID THE DEBTOR HEREUNDER.

51. Finish Line is liable to Plaintiff for actual damages, punitive damages and reasonable attorney's fee and costs.

52. The defendants are liable to Plaintiff for actual damages, punitive damages and reasonable attorney's fee and costs.

WHEREFORE, Plaintiff claims damages, punitive damages, and attorney's fees and costs.

        PLAINTIFF, KOLBY EDWARDS

        By: /s/ *Daniel S. Blinn*
            Daniel S. Blinn (ct02188)
            Consumer Law Group, LLC
            35 Cold Spring Rd. Suite 512
            Rocky Hill, CT  06067
            Tel. (860) 571-0408
            Fax. (860) 571-7457
            dblinn@consumerlawgroup.com